IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVIDE M. CARBONE,       )
                                 )
      Plaintiff,        )
                                 )    Case No. 1:16-cv-01720-ODE
v.                         )
                                 )
CABLE NEWS NETWORK, INC.,  )
                                 )
Defendant.          )


**RESPONSE IN OPPOSITION TO DEFENDANT'S**
**<u>MOTION TO STRIKE OR, IN THE ALTERNATIVE, TO DISMISS</u>**

## INTRODUCTION

In June of last year, CNN changed Mr. Carbone's life forever. Without basis in fact and with warning that its planned attack was wrong, CNN told the world that Mr. Carbone, a healthcare executive with over 30 years of experience and impeccable credentials, was a man who let babies die at three times the national rate, at the hand of a surgeon who had no business operating on them, and all so he could line his pockets. It was a vicious and baseless attack that left Plaintiff without employment and exiled from the community that once embraced him. Defendant created this false narrative by falsely and recklessly comparing a raw mortality rate with risk-adjusted data, a comparison criticized by experts.

After striking at the core of his integrity, Defendant now seeks to strike Plaintiff's right to access justice through the court system. Defendant seeks to dismiss Plaintiff's complaint as a matter of law, citing Georgia's new "anti-SLAPP" statute, and arguing Plaintiff cannot proceed with his case unless he can rebut the veracity of Defendant's secret source and show convincing evidence for his claim without discovery. Fortunately, the law does not require Mr. Carbone to make such a showing. And he can more than meet the burdens that may lie before him. First, even if the Court applies Georgia's new "anti-SLAPP" statute (which it should not), Mr. Carbone can show a probability of success. Second, he has more

than adequately pled his case and Defendant's motion to dismiss should be denied.

## FACTUAL BACKGROUND

This action arises out of CNN's publication of a series of 25 false and defamatory reports concerning Mr. Carbone's oversight and operation of the pediatric cardiac surgery center program at St. Mary's Medical Center ("St. Mary's") ("program"), where he served as CEO ("CNN series"). [CNN articles and videos (Ex.s 1-16); Compl. ¶¶ 3-6, 48-68]. The gist of the coverage falsely accused Plaintiff of unprofessional and unethical conduct that endangered patients' lives, claiming that St. Mary's performed pediatric heart surgeries purely for profit with a death rate three times higher than the national average, namely 12.5% at St. Mary's versus 3.3% nationwide. [*Id.*].

In fact, the mortality rate at St. Mary's program was 4.7%, which was in line with the national average. [Carbone Decl. (Ex. 17) ¶ 39; Compl. ¶¶ 7, 106, 124].[1] The hospital program, along with nearly two-thirds of similar programs across the United States, received a two-star ranking from the Society of Thoracic Surgeons

---

[1] The hospital's risk-adjusted rate was 5.3% through the fall of 2014, but dropped after the full 2014 calendar year was included. Either number (4.7% or 5.3%) is much less than three times the national average, and in fact were within the 95% confidence interval of the reported national average. [St. Mary's program website statements (Ex. 22) at p. 3; Ex. 17 at Ex. A at p. 7; Compl. ¶¶ 106, 124].

("STS"), the leading medical professional data repository that benchmarks the performance of pediatric cardiac programs across the country—an organization that even Defendant recognizes as the "gold standard" in the industry. [Ex. 17 ¶¶ 36, 45-47; 6/22/15 Tenet e-mail to CNN (Ex. 21); Compl. ¶¶ 45, 107, 130, 149]. The two-star rating means St. Mary's had an average expected mortality rate (as opposed to higher or lower than expected). [*Id.*]. Defendant never mentioned St. Mary's 2-star rating in its broadcast. [*See* Ex.s 1-16]. The State of Florida responded to Defendant's reporting by chastising the network for its sensationalized and false reporting. [6/8/2015 Florida Press Statement (Ex. 31)].

Defendant made its own calculation of a raw mortality rate for St. Mary's and reported it as 12.5%. [Ex.s 1-5, 7, 10, 12, 21; Compl. ¶¶ 48-51, 54, 57, 129].[2] But St. Mary's raw mortality rate was actually 8.6%. [Ex. 17 ¶ 41]. Defendant then compared its self-calculated (incorrect) raw mortality rate for St. Mary's to a national rate, which, because of its sheer volume and scope of cases, reflects a risk adjusted calculation. [Ex. 17 ¶ 40]. Defendant claims its national number is a raw number for open heart surgeries only. [Ex. 1-2]. Defendant initially claimed this

_____

[2] Defendant did not disclose to its audience that the numbers it used included only some of the relevant surgery numbers; Defendant never mentioned that it was only a partial set of information gleaned from state reports that had nothing to do with mortality rate calculations. [Ex. 17 (Ex. B at p. 2), 21].

was a number cited by the STS.  [*Id.*].  But Defendant has never actually cited a

publicly published national mortality rate.  And the only evidence from the STS

shows an effectively risk-adjusted mortality rate for *all* surgeries of 3.3% (not just

open heart surgeries).  [Ex. 17 at Ex. A, p. 8].  That evidence also shows that St.

Mary's risk-adjusted rate (4.7%) is well in line with the national average.  [*Id.*].

The STS specifically warns against comparisons using raw clinical

outcomes and explains that one can only reach a fair comparison through the use of

risk-adjusted data.  [STS statements (Ex.s 23 and 24); Compl. ¶¶ 92-93].  Without

risk-adjustment, the STS found that hospitals would be terrified to operate on the

sickest patients for fear of hurting their mortality rate.  [STS statement (Ex. 25)].

As a result, the STS found that the sickest patients—those most likely to benefit

from surgeries—would be left without treatment options.  [*Id.*].

Dr. Jeffrey Jacobs, Defendant's consultant, has warned against the use of

non-risk-adjusted data:  in a peer-reviewed paper, he explained that risk adjustment

is regarded as an "essential component of outcomes profiling" and that "unadjusted

data often misclassify programs as high or low mortality outliers when in fact their

results are average."  [Ex. 26 at p. 724].  Dr. Jacobs has further stated, on behalf of

the STS, that the public should not judge hospitals by non-risk-adjusted data:

STS continues to lead efforts in the reporting of clinical outcomes

4

> data to the public. If we do not publish our own results, the public will judge our performance based on unadjusted or inadequately adjusted administrative data.

[July 22, 2014 STS statement (Ex. 27); Compl. ¶¶ 96-99]. Dr. Marshall Jacobs, also a STS leader, has spoken out about the importance of using risk-adjusted data:

> Reporting hospital surgical outcomes using risk-adjusted analysis is extremely important because it allows for a fair assessment, on a level playing field, of outcomes across hospitals that treat different populations of patients.

[Feb. 25, 2015 STS statement (Ex. 28); Compl. ¶ 92]. Finally, lead correspondent on the CNN series, Elizabeth Cohen, has also publicly discussed the importance of using risk-adjusted data. [Cohen articles (Ex.s 29-30); Compl. ¶¶ 94-96].

The CNN series identified Plaintiff as the CEO of St. Mary's, displayed his picture, and showed him in an ambush interview at his home. [Ex.s 1-4, 10, 12-13, 16; Compl. ¶¶ 48-51, 57, 59-60, 63, 160-164]. The CNN series included criticism of Plaintiff's corporate decisions and accused him of ignoring a high mortality rate for babies so that he could pocket profits. [Ex.s 2, 6; Compl. ¶¶ 49, 53].

Plaintiff was known to the local and national healthcare communities as the CEO of St. Mary's and the person in charge of hospital administration decisions. [Ex. 17 ¶¶ 16-19; Drake Decl. (Ex. 18) ¶ 11; Pollick Decl. (Ex. 19) ¶ 6; Compl. ¶¶ 24, 175]. Defendant admits that the decisions that led to St. Mary's mortality rate

were Plaintiff's "professional responsibilities." [Doc. 11 at p. 8].[3]

As a result of the CNN series, Plaintiff was forced to resign as CEO and has not yet secured new employment. [Ex.s 17 (¶ 85, 90-99), 18 (¶¶ 15-23), 19 (¶¶ 10-15); Wiederhold Decl. (Ex. 20) ¶¶ 9-13; Compl. ¶¶ 180-88]. CNN viewers harassed Plaintiff after the CNN series. He received a message asking if he was "still murdering babies in the name of corporate greed." [Ex. 17 ¶ 101; Compl. ¶ 186]. He has received other messages calling him a "murderer," "baby killer," "corporate scum bag," and "corporate baby killer." [Ex. 17 ¶ 102; Compl. ¶ 187].

## PROCEDURAL BACKGROUND

After Plaintiff filed his complaint, Defendant filed a motion to strike under Georgia's new "anti-SLAPP" statute, or to dismiss the complaint. [Doc.s 1, 5].

---

[3] One of Plaintiff's decisions was to engage in a peer review of the program. [Ex. 17 ¶ 70; *see also* Doc. 5-2 at p. 2 of 24]. As part of the peer review, five doctors visited St. Mary's for approximately six hours. [Ex. 17 ¶¶ 70-71]. The review was not part of any official state process. [*Id.* ¶¶ 66-69]. Florida's Department of Health specifically instructed the doctors not to comment on any state compliance in the peer review. [*Id.* ¶ 68]. After the peer review site visit, the doctors verbally shared their positive impressions of the program and later submitted letters. [*Id.* ¶¶ 75-78]. The letters themselves were not part of any administrative proceeding and the State of Florida stated that the "opinions expressed within the enclosed reports [from the individual doctors] that are outside the stated objectives of the program evaluation are solely those of that team member, not the Florida Department of Health." [Doc. 5-1 at p. 2 of 24]. The CNN series cited one out of 24 pages of those letters. [Ex. 1].

Plaintiff requested discovery to respond to Defendant's fact-based motion (which

Defendant opposes), in case the Court applies the new statute.  [Doc.s 9, 11, 13].

## ARGUMENT

### I. Defendant's motion to strike should be denied

Defendant's motion to strike should be denied either because the new "anti-

SLAPP" statute (the "Act") is unconstitutional, it does not apply to this case, or

because Plaintiff can meet the standard that the Act imposes.

A.    The new "anti-SLAPP" statute is unconstitutional

Defendant's motion to strike asks the Court to weigh disputed facts and

render a decision on the merits without a jury.  The Act allows defendants to move

to strike claims they assert infringe on their First Amendment rights on an issue of

public interest.  O.C.G.A. § 9-11-11.1(b)(1).  Once a motion to strike is filed, the

burden shifts to the nonmovant to show "there is a probability that the nonmoving

party will prevail on the claim."  *Id.*  When ruling on a motion to strike, "the court

shall consider the pleadings and supporting and opposing affidavits."  *Id.*

The Seventh Amendment of the United States Constitution requires that

Plaintiff's right to a jury trial on disputed issues of material fact "be preserved

inviolate."  Yet, the Act explicitly directs the Court to "consider…supporting and

opposing affidavits" to determine if Plaintiff meets his burden of establishing a

"probability that [he] will prevail" on the merits of his claim. *Id.* at (b)(1)-(2). As such, the Act violates the Seventh Amendment, and Plaintiff should not be made to meet its "probability of success" standard.

Other courts have found that anti-SLAPP statutes violate the Constitution. *See*, *e.g.*, *Davis v. Cox*, 351 P.3d 862, 867 (2015). In *Davis*, the Supreme Court of Washington found that because its state's anti-SLAPP statute "provides a burden of proof concerning whether the evidence crosses a certain threshold of proving a likelihood of prevailing on the claim," the statute impermissibly "creates a truncated adjudication of the merits of a plaintiff's claim, including nonfrivolous factual issues, without a trial." The court held that "[s]uch a procedure invades the jury's essential role of deciding debatable questions of fact…violat[ing] the right of trial by jury." *Id.* at 874. The Minnesota Supreme Court found its state's anti-SLAPP statute defied a constitutional interpretation. *Leiendecker v. Asian Women United of Minnesota*, 848 N.W.2d 224 (Minn. 2014) (finding constitutionality question not before it, but remarking on impossibility of applying constitutional avoidance doctrine).[4]

---

[4] Plaintiff acknowledges that the anti-SLAPP statutes in these cases included a "clear and convincing" standard of review, while Georgia's statute has a "probability of success" standard. But each of the statutes require a judicial weighing of disputed facts that intrudes on the province of the jury.

While some courts have upheld anti-SLAPP statutes, they have done so either without discussion of Seventh Amendment implications or through the doctrine of constitutional avoidance, which "requires [the court] to choose a constitutional interpretation of a statute over an unconstitutional interpretation when the statute is genuinely susceptive to two constructions." *Davis*, 351 P.3d at 867. By grafting onto their anti-SLAPP statutes a standard akin to a Rule 12 or Rule 56 standard, these courts avoid the obvious conflict between the Seventh Amendment and the Act's design. *See, e.g., Wilcox v. Superior Court*, 27 Cal. App. 4th 809, 823 (1994) (holding that plaintiff must make out prima facie showing after crediting all of his evidence).

This Court should follow Washington and decline to save the Act from its Constitutional infirmity. *See Davis*, 351 P.3d at 871 (holding that it was neither reasonable nor possible to impose a summary judgment analysis onto statute as matter of construction). The Act unreasonably invades Plaintiff's Constitutional right to have a jury determine disputed facts in a non-frivolous case.

B.    The new "Anti-SLAPP" statute cannot apply to this case

   1.    *The Act conflicts with the Federal Rules*

To even consider applying the Act, the Court must engage in constitutional avoidance and impose a standard of review more akin to a summary judgment

standard.  In doing so, the Court creates a unique impediment to applying a state anti-SLAPP statute in a federal court sitting in diversity jurisdiction (as here).  The Act cannot apply here because it conflicts with the Federal Rules of Civil Procedure.  *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1334 (D.C. Cir. 2015) (refusing to apply analogous Washington D.C. anti-SLAPP).

The Supreme Court has a "familiar framework" for assessing the supremacy of a Federal Rule: (1) does the Federal Rule "answer[] the question in dispute," and (2) if so, it governs, unless it "exceeds statutory authorization or Congress's rulemaking power."  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 130 S. Ct. 1431, 1437 (2010).  A court need "not wade into *Erie's* murky waters unless the federal rule is inapplicable or invalid."  *Id.*

Once a defendant files a motion to strike, with few exceptions, discovery is stayed pending a ruling on the motion.  O.C.G.A. § 9-11.11.1(d).[5]  Given the Act's prohibitions on discovery, the motion to strike procedure allows a defendant to file a fact-based dispositive motion while depriving the nonmovant of facts and the right to pierce a movant's stated facts through cross examination.  Because the Act directly collides with Rule 12 and Rule 56, it cannot apply in federal court.

---

[5] A party can move for discovery for "good cause."  *Id.*  And Plaintiffs are entitled to discovery on actual malice if public figure status is claimed.  *Id.* at (b)(2).

i.    The Federal Rules Answer the Question in Dispute

The Act directly collides with Rules 12 and 56, which answer the disputed question. *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27-28 & n.4 (1988) (applying direct collision standard). The federal and state law need not be "perfectly coextensive and equally applicable to the issue at hand," but the "direct collision language" reflects a requirement "that the federal [law] be sufficiently broad to cover the point in dispute." *Id.* at 27 n.4. A federal rule cannot "be narrowly construed…to avoid a 'direct collision' with state law." *Walker v. Armco Steel Corp.*, 446 U.S. 740, 750 (1980); *Shady Grove,* 130 S. Ct. at 1442.

Rules 12 and 56 are sufficiently broad to cover the point in dispute: whether the court can issue a pretrial ruling disposing of Plaintiff's defamation claim. As *Abbas* stated, "Rules 12 and 56 help form 'an integrated program' for determining whether to grant pre-trial judgment in cases in federal court." 783 F.3d at 1334 (*quoting Makaeff v. Trump University, LLC*, 715 F.3d 254, 274 (9th Cir. 2013) (Kozinski, J., concurring).[6] Both rules directly collide with the Act, and "answer

---

[6] *See also Makaeff, LLC*, 736 F.3d at 1188 (9th Cir.2013) (Watford, J., dissenting) (Rules 12 and 56 "establish the exclusive criteria for testing the legal and factual sufficiency of a claim in federal court."); *3M Co. v. Boulter*, 842 F. Supp. 2d 85, 107 (D.D.C. 2012) (explaining Rules 12 and 56 are so broad as to cover "all categories of cases and provide the exclusive means by which a motion may challenge the sufficiency of a claim.").

the same question about the circumstances under which a court must dismiss a case before trial." *See Abbas*, 783 F.3d at 1333-34 (discussing analogous D.C. act). The Federal Rules answer that question differently than the Act: they do not require plaintiffs to show probability of success. *See id.* (same).

This difference is important: simply put, the Act's probability of prevailing standard is "more difficult for plaintiffs to meet than the standards imposed by Federal Rules 12 and 56." *Id.* at 1334-35 (same); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (holding that plausibility is lower bar than probability).[7] A plaintiff can even survive a Rule 12 motion even "'if it strikes a savvy judge that actual proof of the facts alleged is improbable.'" *Twombly*, 550 U.S. at 556. And "Rule 56 permits summary judgment only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* "In short, unlike the…Act, the Federal Rules do not require a plaintiff to show a [probability of prevailing] on the merits in order to avoid pre-trial dismissal." *Id.* (discussing D.C. act).

The Act also collides with Rules 12 and 56 by forcing a court to displace the

---

[7] The D.C. act's likelihood of success on the merits standard is equivalent to the Act's probability of prevailing on the merits standard. *See Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 n.2 (11th Cir. 1983).

fact-finder by weighing conflicting evidence and a plaintiff's likelihood of success. *3M Co.*, 842 F. Supp. 2d at 106-08 (discussing the analogous D.C. act). "[B]ecause the…Act requires the court to undertake a fact-finding role, even where there is a genuine issue of material fact, the statute directly collides with the prohibition of Rules 12(d) and 56." *Id.* at 108 (same).

Another direct collision with Rule 56 arises because the Act subjects plaintiffs to evidence-based adjudication, while depriving them of discovery. Although Rule 56(d) gives courts discretion to disallow discovery, "the Supreme Court has restated the rule as requiring…discovery 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.'" *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001); (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)).[8]  In contrast, the Act makes discovery the exception, not the rule.  O.C.G.A. § 9-11-11.1(d).  Courts have thus refused to enforce discovery limitations imposed by anti-SLAPP statutes.  *See, e.g.*, *Metabolife*, 264 F.3d at 846; *Nixon v. Haag*, 2009 WL 2026343, at *3-4 (S.D. Ind. July 7, 2009).

---

[8] *See also Makaeff*, 715 F.3d at 274 (Kozinski, J., concurring) ("The Federal Rules don't contemplate that a defendant may get a case dismissed for factual insufficiency while concealing evidence that supports plaintiff's case."). Chief Judge Kozinski's concurrence thoroughly dismantles California's analogous anti-SLAPP statute.

Ultimately, Rule 12 and Rule 56 answer the same question as the Act. *See Abbas*, 783 F.3d at 1336 (discussing analogous D.C. act); "Under *Shady Grove*, Rules 12 and 56 therefore govern in diversity cases in federal court, unless [they] violate the Rules Enabling Act." *Id.* They do not.

### ii.    Federal Rules 12 and 56 Do Not Violate the REA

Turning to *Shady Grove'* second step, Rules 12 and 56 "will govern unless they were adopted in violation of the Rules Enabling Act ("REA"), 28 U.S.C. § 2072." *3M Co.*, 842 F. Supp. 2d at 100 (*citing Shady Grove*, 130 S. Ct. at 1442). "The test [is]…whether a [federal] rule really regulates procedure—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them." *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941). Rules 12 and 56 are quintessentially procedural: they regulate the judicial process for pre-trial adjudication of a claim. *Abbas*, 783 F.3d at 1337. The Act cannot be applied in federal courts because it directly collides with the valid Rules 12 and 56—both of which answer the issue in dispute. Accordingly, this Court must deny Defendant's anti-SLAPP Motion.

### iii.    Anti-SLAPP Enforceability Arguments are Unavailing

Defendant argues (in its opposition to Plaintiff's Rule 56(d) motion) that this Court should follow courts that have applied anti-SLAPP statutes. But Chief Judge

Kozinski of the Ninth Circuit put it best: "The D.C. Circuit has reached the overdue conclusion that anti-SLAPP motions don't belong in federal court because they directly conflict with the Federal Rules of Civil Procedure. … Now we've got a circuit split, and we're standing on the wrong side." *Travelers Cas. Ins. Co. of Am. v. Hirsh*, --- F.3d ---- 2016 WL 4120689, at *3 (9th Cir. Aug. 3, 2016) (Kozinski, J. concurring).

Defendant cites cases from the First, Second, Fifth, and Ninth Circuits enforcing anti-SLAPP statues—all of which are flawed. The First Circuit's opinion in *Godin v. Schencks*, 629 F.3d 79 (1st Cir. 2010), fails to apply *Shady Grove's* methodology. The court should have started by interpreting the scope and meaning of the Rules 12 and 56, instead of comparing them side-by-side with Maine's anti-SLAPP and using a baseless "substitution standard" *Id.* at 88-89. The *Godin* court also avoided a conflict by focusing on the state law's purpose, rather than its outcomes. *Id.* at 89; *see Shady Grove*, 130 S. Ct. at 1440 ("[W]hat matters is the law the Legislature *did* enact."). Although *Godin* concedes that Rules 12 and 56 "govern all categories of cases," the court does not takes this observation to its logical conclusion by refusing to apply state law. 629 F.3d at 88.

The Second Circuit's application of Nevada's statute is inapposite, because Nevada's anti-SLAPP is overtly a substantive immunity, rather than a procedural

tool. *Adelson v. Harris*, 774 F.3d 803, 809 (2d Cir. 2014) ("The specific state anti-SLAPP provisions applied by the…court—immunity from civil liability…and mandatory fee shifting—seem to us unproblematic.").

The Ninth Circuit's seminal case enforcing California's anti-SLAPP has been eroded and derided in the Ninth Circuit and beyond. That opinion—*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963 (9th Cir. 1999)—was "wrong even on its own terms." *Makaeff*, 715 F.3d at 274 (Kozinski, J., concurring). "*Newsham* recognized a 'commonality of purpose' between the state law and Federal Rules of Civil Procedure 8, 12 and 56, but shrugged it off because the parties could take advantage of both the Federal Rules and the very similar anti-SLAPP procedures." *Makaeff*, 715 F.3d at 274 (discussing *Newsham* 190 F.3d at 972–73). *Newsham* mistakenly engaged in "in conflict analysis without first determining whether the state rule is, in fact, substantive." *Id.* at 273. The Ninth Circuit has since refused to apply anti-SLAPP discovery bars and immediate appeal provisions—which the Act also has. *Hyan v. Hummer*, 825 F.3d 1043, 1047 (9th Cir. 2016); *Metabolife,* 264 F.3d at 845.

The Fifth Circuit applied an anti-SLAPP statute with no analysis whatsoever. *Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 168-69 (5th Cir. 2009). The court merely cited to *Newsham* and three other cases. *Id.*

When looking for analogous Eleventh Circuit precedent, one finds that this circuit is not shy about refusing to apply state anti-SLAPP statutes in federal court. In *The Royalty Network, Inc. v. Harris*, 756 F.3d 1351 (11th Cir. 2014), the court refused to apply the previous version of Georgia's anti-SLAPP that conflicted with Rule 11. *Id.* at 1362. Defendant seeks to rely on a Southern District of Florida case that applied a California anti-SLAPP. *Tobinick v. Novella*, 108 F. Supp. 3d 1299 (S.D. Fla. 2015). But the nonmovant there, unlike here, did not challenge the applicability of the anti-SLAPP in federal court. Without the benefit of counterarguments, the court held that "because the…[California] anti-SLAPP…has previously been allowed in federal court, the Court follows *Newsham* and applies state law." *Id.* at 1305 n.4. There is no such precedent enforcing the Act.

2.     *The Act cannot apply retroactively*

Even if the Court finds the Act can be applied in federal court, substantive statutes like the Act cannot be applied retroactively to Plaintiff's claims. If this Court finds the Act does not conflict with the Federal Rules, it can only apply the Act if, based on an "unguided *Erie* choice," the Court finds that the law affects substantive rights. *Newsham*, 190 F.3d at 973 (9th Cir. 1999); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural

17

law.").[9]  In essence, the Act is either procedural and cannot be applied in federal court, or it is substantive and cannot be applied retroactively.  Either way, the Act cannot be applied to Plaintiff's claim.

"The Georgia Supreme Court has held that a statute applies only prospectively unless the statute itself expressly states otherwise."  *BankWest, Inc. v. Baker*, 446 F.3d 1358, 1366 (11th Cir. 2006) (discussing *Polito v. Holland*, 258 Ga. 54, 55 (1988)).  This default rule has a narrow exception:  "where a statute governs *only procedure* of the courts…it is to be given retroactive effect absent an expressed contrary intention."  *Polito*, 258 at 55 (emphasis supplied).  This narrow exception cannot apply when a statute governs both substance and procedure, because the statute would no longer "only govern procedure."  *See id.*

Defendant cites to *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441 (11th Cir. 1991), in which the court retroactively applied a statute that was both procedural and substantive.  But there, the substantive aspect of the statute was

---

[9] *See also Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 84-85 (D.D.C. 2012), *aff'd*, 720 F.3d 932 (D.C. Cir. 2013) ("[E]ither the [analogous] D.C. anti-SLAPP statute is partially substantive (or has substantive consequences) and is therefore not retroactive…or it is purely procedural and inapplicable in federal court under *Erie*.").  The Act has many substantive aspects, including reallocation of the burden of proof and attorney's fees provision. *See, e.g.*, *Godin*, 629 F.3d at 85 n.10, 89 (discussing burden and fees); *Newsham*, 190 F.3d 971-73 (fees).

"merely a codification of existing common law" *Id.* at 1446.  Thus, it was "not a retroactive provision," even when applied to circumstances that arose before codification.  *Id.*

Because this is a diversity action, the Act can only be applied if it affects substantive rights.  Unlike *Ferrero*, in which the statute was also both substantive and procedural, here the substantive nature of the Act is not a mere codification of the common law.  Moreover, the Legislature did not express an intent to apply the Act retroactively.[10]  Accordingly, the Act does not fit into the narrow exception allowing for retroactive application of "a statute [that] only governs procedure."

The conduct giving rise to this action predates the July 2016 effective date of the Act, as does the date Plaintiff filed his Complaint. *Compare* O.C.G.A. § 9-11-11.1 *with* Doc. 1 *passim*.  Thus, Defendant's Anti-SLAPP Motion must be denied for seeking relief under the temporally inapplicable Act.

C.    <u>Plaintiff can show a probability of success</u>

1.    *Standard of review*

The Court should find that the Act is unconstitutional or inapplicable,

---

[10] Indeed, the Legislature initially included a retroactivity provision in the Act, but then thought better of it.  *Compare* LC 41 0455 (Ex. 32) at § 3:106-07 with 2016 Ga. Laws Act 420 (H.B. 513) at § 4.

obviating the need to determine if Plaintiff can show a probability of success. But even assuming the Act applies, Plaintiff can show a probability of success.

The Act has yet to be interpreted by any Court. The Act's standard of review is similar to California's "anti-SLAPP" statute's standard for surviving a motion to strike, namely that a complaint falling under the statute "shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Cal. Civ. Proc. § 425.16(b)(1). Courts have found this standard requires only a "minimum level of legal sufficiency and triability." *Linder v. Thrifty Oil Co.*, 2 P.3d 27, 33 n.5 (Cal. 4th 2000); *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 598 (9th Cir. 2010). Courts have also described the standard as one where "the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Wilson v. Parker, Covert & Chidester,* 50 P.3d 733, 739 (Cal. 4th 2002); *Mindys Cosmetics*, 611 F.3d at 599. "The required probability that [a plaintiff] will prevail need not be high." *Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2010).[11]

---

[11] A prima facie standard, such as the one applied to California's "anti-SLAPP" statute, is the only one the Court can apply to avoid an unconstitutional

2. *Plaintiff can establish his defamation claim*

"A cause of action for defamation consists of four elements: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Infinite Energy, Inc. v. Pardue*, 310 Ga. App. 355, 356 (2011). Defendant claims that Plaintiff cannot show the broadcasts (1) were false and (2) concern him, and further claims that the broadcasts are not actionable because they reflect (3) mere academic disagreements or (4) opinions, or (5) a fair report. Defendant is wrong.

i. Plaintiff shows that the CNN series was false

At the heart of the CNN series was a claim that Plaintiff oversaw a hospital that had a "death rate for open heart surgeries" that was three times higher than the national average, namely 12.5% at St. Mary's versus 3.3% nationwide. [Ex.s 1-16; Compl. ¶¶ 3-6, 48-68]. In fact, the mortality rate at St. Mary's program during the relevant time was 4.7%, which was in-line with the national average. [Ex. 17 ¶ 39; Compl. ¶¶ 7, 106, 124]. Further, St. Mary's program received the same two-star rating as all similar programs in Florida. [Ex. 17 ¶ 36; Compl. ¶¶ 45, 107, 130,

---

interpretation of the statute. *See supra* Section I.A., pp. 7-9.

149].  Put simply, there was nothing inferior about the mortality rate at the St. Mary's program and the CNN series was false when it said otherwise.

Defendant created the false numbers and comparison when it invented its own *raw* calculation of the St. Mary's program's mortality rate (which was numerically incorrect) and then compared it to a national *risk-adjusted* mortality rate.[12]  Defendant did not mention whether the mortality rates used in the broadcasts were based on raw or risk-adjusted numbers, but after being sued, Defendant falsely claims that it was making a comparison among the same types of numbers—namely numbers consisting of only raw data about open heart surgeries.[13]  This cannot be not true for multiple reasons.

First, if Defendant was attempting to report the raw mortality rate for St. Mary's, it failed to do so.  Defendant reported that the raw mortality rate at St. Mary's was 12.5% when it was actually 8.6%.  [Ex.s 1-5, 7, 10, 12, 17 (¶ 41), 21; Compl. ¶¶ 48-51, 54, 57, 129].

---

[12] A national mortality rate is naturally risk-adjusted because of the high volume and scope of cases included (from the most risky to the least risky).  [Ex. 17 ¶ 40].
[13] After its first six false broadcasts, Defendant changed the alleged source of its national mortality rate and described it as "not risk-adjusted."  [Ex. 7].  This information came only in the later print article and not on another national television broadcast.  In one other follow-up article (not on television), Defendant admits that it has "no idea" how many operations were performed at St. Mary's that are relevant for STS mortality rate calculation purposes.  [Ex. 9].

Second, Defendant could not have reported a national raw mortality rate for open heart surgeries (as opposed to open and closed heart surgeries) because there is no such reported number in existence. [Ex. 17 ¶¶ 29-23; Compl. ¶¶ 85, 89-90, 111]. Defendant has not cited to any published national mortality rate. The only evidence of a national rate was effectively risk-adjusted and was for all surgeries (not just open heart surgeries), and was provided only to St. Mary's (not the public). [Ex. 17 at Ex. A at p. 8]. This evidence shows an overall effectively risk-adjusted national mortality rate for *all* surgeries of 3.3%. [*Id.*]. Thus, that 3.3% number cannot also be the national mortality rate for just *open heart* surgeries—aside from the fact that there is no such statistic available. This evidence further shows, on its face, that the STS made a comparison of St. Mary's risk-adjusted rate (4.7%) to the national rate (3.3%) and showed the numbers were in-line with one another. [*Id.*].

Defendant did not disclose information about how it derived its made-up national mortality rate. Defendant has changed its position on the source of the number multiple times. First, Defendant claimed that it was published by the STS, (the "gold standard" for surgical outcomes reporting) [Ex. 1], then Defendant claimed it came from Dr. Jeffrey Jacobs [Ex. 7], and most recently Defendant says it was from a secret source [Doc. 11 at p. 11]. Plaintiff cannot refute information

provided by a secret source without discovery. But there is strong evidence to demonstrate that no raw national mortality rate for open heart surgeries would ever be provided by the STS or Dr. Jacobs.

Put simply, Defendant's claim about what is included in the national mortality rate used in its broadcast is impossible. There is no trace of this number from the STS. And the STS specifically warns against reporting raw clinical outcomes and explains that one can only reach an "apples to apples" comparison through the use of risk-adjusted data to avoid the exact problem that Defendant created—a comparison of raw mortality information that is not risk-adjusted to consider outside health factors. [Ex.s 23-24; Compl. ¶¶ 92-93]. Without risk-adjustment, the STS fears that hospitals would be terrified to operate on the sickest patients for risk of hurting their mortality rate, leaving the sickest patients—those most likely to benefit from surgeries—without treatment options. [Ex. 25].

Given its stated goal and advocacy against comparisons of raw data among hospitals, it is irrational to think that the STS would give information to Defendant to make such a comparison. It is unsurprising that Defendant never disclosed how it arrived at its reported national mortality rate—because the rate is not comparable to raw program-based numbers, does not reflect only open heart surgeries, and did not come from STS, as claimed. In sum, because the STS does not report raw

mortality rates for open heart surgeries, Defendant could not have used such a rate, and thus could not have made an "apples to apples" comparison, as it now claims.

In fact, the STS awarded St. Mary's a 2-star rating (out of a possible 3), which means that it had an average expected mortality rate (as opposed to higher than expected or lower than expected). [Ex.s 17 (¶¶ 36, 45-47, 21; Compl. ¶ 45]. That the STS awarded St. Mary's a 2-star rating—the same as all of its Florida peers—was a flashing red light of the falsity of Defendant's claim that St. Mary's mortality rate was three times the national average. It is inconceivable that a program's mortality rate could be so much higher than the national average, yet still receive an average rating. Defendant's false comparison was glaringly obvious. Unsurprisingly, Defendant never mentioned the St. Mary's program's 2-star rating in its broadcast, though St. Mary's pointed it out prior to the broadcast. [Ex. 17 (Ex. B at p. 2); Compl. ¶ 149].

It also seems impossible that Dr. Jeffrey Jacobs would have provided a raw national mortality rate for only open heart surgeries for Defendant for use in its broadcast. First, Dr. Jacobs is a leader in the STS. It is illogical that he would provide information for a use counter to STS's stated goals and objectives. Further, he has repeatedly and publicly stated that raw comparisons are worthless to consumers. [Ex. 26 at p. 724 (stating that risk adjustment is regarded by most as

an "essential component of outcomes profiling" and that "unadjusted data often misclassify programs as high or low mortality outliers when in fact their results are average.")]. Dr. Jacobs has further stated publicly, and on behalf of the STS, that the public should not judge hospitals by non-risk-adjusted data: "STS continues to lead efforts in the reporting of clinical outcomes data to the public. If we do not publish our own results, the public will judge our performance based on unadjusted or inadequately adjusted administrative data." [Ex. 27 at p. 1]. Thus, Dr. Jacobs warned against exactly what Defendant did in the CNN series.[14]

> ii.     The CNN series is not about an academic disagreement

Instead of broadcasting the truth about St. Mary's program, which would not have been sensational enough to attract viewers, Defendant plucked random and incomplete numbers from the St. Mary's program and related them to a national number to which they were incomparable. It is not an academic disagreement as to whether the comparison is fair—or even useful. No one claims that it is helpful for consumers to compare raw data. The opposite is true; the medical community has

---

[14] If Dr. Jacobs had a hand in the creation of the alleged raw national mortality rate for open heart surgeries, it would have been an attempt to manipulate the numbers to intentionally hurt the program at St. Mary's. He admitted to Plaintiff that he intentionally works to shut down small programs, to the benefit of his own business interests. [*See* Ex. 17 ¶ 73; Compl. ¶ 79, 133-140].

repeatedly warned against the use of non-risk-adjusted data: "Adjusting for [] risk factors allows us to better understand reported mortality rates, especially for centers that operate on the most challenging patients." [Ex. 28]. And Defendant, through its agent Elizabeth Cohen, knew there was no medical or academic support for comparing a raw mortality rate to a risk-adjusted one. She has written on the importance of using risk-adjusted data. [Ex.s 29-30; Compl. ¶¶ 94-96].

But even assuming there was an academic disagreement about which way mortality numbers should be compared (which there is not), the CNN series was not about such an academic disagreement. An academic disagreement is present when the *research*, not the *person* is criticized. *Dilworth v. Dudley*, 75 F.3d 307, 310 ("The case before us is one in which not the character but the ideas of the scholar are attached."); *Ezrailson v. Rohrich*, 65 S.W.3d 373, 381 (Tex. App. 2001) ("The gist of the article is a criticism of [plaintiff's] medical science ideas."). Here, Defendant did not criticize how mortality rates are reported—the use of risk-adjusted data versus raw data. Indeed, Defendant did not even mention which type of numbers it was using in the initial broadcast. [Ex.s 1-2]. Instead, Defendant used fabricated statistics to criticize Plaintiff and the hospital for allegedly killing babies at an outrageously high rate, all in the name of corporate greed.

Defendant only cited to inapposite cases that involved academic discussions

27

in an academic context—research reports written by academics for academics. [*See* Doc. 5-1 at pp. 16-18]. The courts in those cases discussed the unique context of academic writing and how academic writers publish their work for the purpose of inviting criticism and rebuttal. *Fikes v. Furst*, 81 P.3d 545, 551 (N.M. 2003) ("Criticism of the work of scholars is generally commonplace and acceptable in academic circles. Thus, statements that may appear in isolation to be defamatory may in fact be particularly appropriate or acceptable criticism when made in an academic setting."); *Dilworth*, 75 F.3d at 309 ("By publishing your views you invite public criticism and rebuttal; you enter voluntarily into one of the submarkets of ideas and opinions and consent therefore to the rough competition of the marketplace."). In contrast, here, Plaintiff published nothing (academic or otherwise) and then Defendant (not an academic) reported a false story about Plaintiff and a hospital killing babies at an alarming rate (not about statistical reporting options), which was meant for consumer audience (not academics).[15]

_____

[15] The court in *Fikes* explained the distinction between statements attacking one's character (this case) and those reflecting academic disagreement, and that even an academic would have a claim for defamation of his character, as opposed to his ideas. 75 F.3d at 310. There can be no doubt that Plaintiff's ideas were not under attack in the CNN series (even if it had been Plaintiff's idea to publish one mortality rate over another, which it was not). Rather, Defendant attacked Plaintiff's character, claiming he oversaw a hospital that performed surgeries for profit, without proper expertise, and killed babies at a high rate.

Academics finding themselves in academic disagreements have a remedy not available to Plaintiff; they can publish a rebuttal in the same or another scholarly journal, equally read by the same academic audience: "Unlike the ordinary citizen, a scholar generally has ready access to the same media by which he is allegedly defamed." *Dilworth*, 75 F.3d at 310. Plaintiff has no such remedy. He does not have ready access to CNN's microphone, because CNN controls it.[16]

    iii.    The CNN series is not opinion

The CNN series was not opinion. Instead, the CNN series is capable of being proven true or false, which makes it actionable; not protected opinion. *Infinite Energy*, 310 Ga. App. at 357-58. Whether Plaintiff oversaw a hospital with a mortality rate three times the national average is not an opinion—it is either a

---

[16] Defendant 's citations to these academic cases are even further off base because most of them hinged on whether there was an innocent construction such that the statements at issue had no defamatory meanings. *Lott v. Levitt*, 556 F.3d 564, 568-70 (7th Cir. 2009) (no defamatory meaning to statement that plaintiff's theory connecting gun ownership and crime rates could not be replicated); *Dilworth*, 75 F.3d at 310 (using "crank" to describe plaintiff not capable of defamatory meaning in academic context); *Fikes*, 81 P.3d at 549 (statements not given defamatory meaning by academic recipients); *Ezrailson*, 65 S.W3d at 382 (no defamatory meaning). Here, Defendant does not and cannot argue that the CNN series is incapable of a defamatory meaning— Defendant falsely accused Plaintiff of being a money grubbing corporate suit who oversaw a program intentionally performing surgeries without the requisite expertise, all in the name of greed. *Underwager v. Salter* is also inapplicable because the grant of summary judgment turned on a lack of showing of actual malice. 22 F.3d 730, 736 (7th Cir. 1994).

true or false statement.  As explained above, the statement is unequivocally false.

Even assuming Defendant merely voiced its "opinion" that St. Mary's mortality rate was three times the national average, such opinion does not gain protection against a defamation action unless Defendant disclosed the factual basis of its alleged opinion.  *See, e.g., 800 Mktg. Solutions, Inc. v. GMAC Ins. Mgmt. Corp.*, 2008 WL 2777140, at *6 (M.D. Ga. 2008).  Defendant did not do so.

First, assuming that Defendant's "opinion" is based on a statement that St. Mary's raw mortality rate was 12.5%, that underlying statement is itself false.  St. Mary's raw mortality rate was 8.6%.  [Ex. 17 ¶ 41; Compl. ¶¶ 48-51, 54, 57, 129]. And any alleged "opinion" could not have been based on a statistic from the STS because the STS did not make any report that St. Mary's mortality rate was three times the national average.  Instead, the STS reported to St. Mary's that its risk-adjusted mortality rate was 4.7% and rated St. Mary's as a two-star institution, finding it had an average expected mortality rate.  [Ex.s 17 (¶¶ 36, 39, 47), 21; Compl. ¶¶ 45, 107, 130, 149].[17]

---

[17] The Supreme Court demonstrated in *Milkovich v. Lorain Journal Co.* that potential statements of opinion, such as "I think Jones lied," may be proven false on two levels.  497 U.S. 1, 20.  "First, that the speaker really did not think Jones had lied but said it anyway, and second that Jones really had not lied."  *Id.*  The equivalent inquiries here are (1) was St. Mary's mortality rate three times the national average and (2) did the STS hold an opinion that St. Mary's mortality rate

Second, Defendant did not disclose that the mortality rate it calculated for St. Mary's included only a partial set of surgeries gleaned from a state filing that had nothing to do with mortality rates. [Ex.s 17 (¶ 42, Ex. B at p. 2), 21].

Third, Defendant did not reveal the source or content of its alleged national raw mortality rate for open heart surgeries. Defendant has changed its story from one impossible source to another, and now claims the source is a secret. [Ex.s 1, 7; Doc. 11 at p. 11].

Thus, even if the broadcast was an opinion (it is not), Defendant has not provided even a scintilla of information about how the alleged "opinion" was derived. Both factors are required and neither is present here.

    iv.    The CNN series is not protected by the fair report privilege

No part of the CNN series is protected by the fair report privilege for two reasons. First, to qualify for the privilege, the report must concern certain statutorily enumerated official proceedings. The CNN series was not of such a proceeding. Second, there was no fair report of anything.

---

was three times the national average. The answer is no to both questions. As stated above, St. Mary's mortality rate was not three times the national average. Instead, it was in line with the national average. And the STS did not hold the opinion that St. Mary's mortality rate was three times the national average. The STS rated St. Mary's as a two-star program, which meant that it had an average mortality rate.

Defendant seeks to summarily dispose of three statements by claiming the protection of the fair report privilege. The first statement is one in a letter from Dr. Jacobs that the St. Mary's program was "the failure of an entire team." [Doc. 5-1 at p. 21]. First, the privilege does not apply to this statement. Defendant conveniently ignores that the statement was not part of any report of the "proceedings of legislative or judicial bodies" or "court proceedings," as required by the statute affording any fair report privilege. O.C.G.A. § 51-5-7(6) and (7). And though courts have ruled that reports of administrative proceedings by governmental agencies to "discipline, remove from office, or revoke a license, are quasi-judicial in nature" and thus are entitled to the fair report privilege (as a "judicial proceeding"), there was no such proceeding here. Defendant argues simply that because a statement was made to an administrative agency, it falls under the privilege. [Doc. 5-1 at p. 22]. That is not the law.

Well before the CNN series, St. Mary's voluntarily submitted to a peer review. [Ex. 17 ¶ 70; *see also* Doc. 5-2 at p. 2 of 24]. The peer review was not an administrative proceeding to "discipline, remove from office, or revoke a license," as required for an administrative proceeding to rise to the level of a quasi-judicial proceeding to fall under the fair report privilege. *Lawton v. Georgia Television Co.*, 216 Ga. App. 768, 771 (1995). ("Administrative proceedings by governmental

agencies to discipline, remove from office, or revoke a license, are quasi-judicial in nature and are entitled, at a minimum, to a qualified privilege.").  It was simply meant to be a collegial peer review by five doctors to help St. Mary's improve as a relatively new program.  [Ex. 17 ¶¶ 69-71].

The review was not part of any official state investigation or process. Indeed, the State of Florida specifically instructed the doctors not to comment on the hospital's Certificate of Need ("CON") compliance during what was supposed to be a peer review.  [*Id.* ¶¶ 66-69].  Even if the peer review had included some official review of the hospital program's CON compliance, there was no threat of the CON revocation as part of the peer review.  [*Id.*].

The letters themselves were not part of any administrative proceeding and the State of Florida made clear that the "opinions expressed within the enclosed reports [from the individual doctors] that are outside the stated objectives of the ***program evaluation*** are solely those of that team member, not the Florida Department of Health." [Doc. 5-1 at p. 2 of 24 (emphasis supplied)].  The comment at issue from Dr. Jacobs that Defendant quoted in the CNN series was not related to the peer review and was included in specific opposition to the State of Florida's instructions not to comment on CON issues.  [*See* Doc. 5-2 at p. 21 of 24 (discussing surgical volume); Ex. 17 ¶ 68].  Thus, Dr. Jacobs' comments were

superfluous to any qualifying official proceeding that was even possibly generated as a result of this peer review.

Second, the CNN series was not a fair report of the peer review process. A fair report "must have the same gist as the proceedings reported." *Lawton*, 216 Ga. App. at 772. The gist of the CNN series was that Plaintiff oversaw a hospital with a mortality rate that was three times the national average. And to the extent the CNN series was about the CON compliance process, there was no fair report of that process. Plucking one comment from 24 pages of letters can hardly be described as a "fair report" of any official proceeding, to the extent any part of these letters could be characterized as such. There was no mention of mortality rates in the peer review letters. [*See* Doc. 5-2].[18]

Finally, assuming both the fair report privilege applies and a fair report was made (neither of which are true), the fair report privilege will not protect false and defamatory statements made with actual malice: "All the privileges contained in

---

[18] Unlike here, in each of the cases that Defendant cited, the defendant was actually making a report on a proceeding as part of a story, as opposed to making a passing mention of some small part of a process. *See Lawton*, 216 Ga. App. 768 (report on an official National Guard investigation); *Morton v. Stewart*, 153 Ga. App. 636 (1980) (Composite Board of Medical Examiners hearing); *McCracken v. Gainesville Tribune, Inc.*, 146 Ga. App. 274 (1978) (Hall County Commissioners of Roads & Revenues hearing).

O.C.G.A. § 51-5-7 [including fair report privilege] are conditional, rather than absolute, and may be lost upon a showing...of 'actual malice.'" *AirTran Airlines, Inc. v. Plain Dealer Pub. Co.*, 66 F. Supp. 2d 1355, 1365 (N.D. Ga. 1999).

Here there is evidence tending to show that Defendant acted with actual malice.[19]  First, Defendant claims reliance on an STS-supported comparison of raw and risk-adjusted mortality rates that the STS's stated mission suggests it would never make.  [Ex.s 23-25; Compl. ¶¶ 92-93].  Second, Defendant knew that the STS awarded St. Mary's a 2-star rating (demonstrating average expected mortality rates).  [Ex.s 17 (¶¶ 36, 45-47), 21; Compl. ¶¶ 45, 107, 130, 149].  It is impossible that the STS could possess numbers showing that St. Mary's had a mortality rate that was three times higher than the national average, yet still rank them as having average expected outcomes.  Third, Defendant was aware—both through its correspondent's knowledge and information shared with it by Plaintiff—that it was making a false comparison.  [Ex.s 17 (¶¶ 45-47), 21, 29-30; Compl. ¶ 94-100].

---

[19] Plaintiff cannot make a definitive showing of actual malice without discovery, as Georgia's new "anti-SLAPP" statute acknowledges by automatically allowing discovery on actual malice when one party claims the plaintiff is a public figure. O.C.G.A. § 9-11-11.1(b)(2).  It would be improper to deny discovery and preclude Plaintiff from making a showing of actual malice to overcome any purported fair report privilege.  *AirTran*, 66 F. Supp. 2d at 1365 (finding summary judgment premature where plaintiff had not yet conducted discovery on its allegations of actual malice); *see* Plaintiff's Rule 56(d) motion [Doc.s 9, 11].

Finally, there is evidence suggesting that Defendant relied on consultants with personal financial motives. [Ex. 17 ¶¶ 63, 73, 81-82; Compl. ¶¶ 79, 133-140].[20]

     v.     Plaintiff shows the CNN series was "of and concerning" him

The CNN series was "of and concerning" Plaintiff. Whether a publication "concerns" a plaintiff is "a matter of identity" so that a publication "concerns" the plaintiff if it is "about the plaintiff." *800 Marketing*, 2008 WL2777140, at *5. The CNN series directly identified Plaintiff as part of the problem at St. Mary's by identifying him as the CEO, showing his picture, and ambushing him on camera at his home. [Ex.s 1-4, 10, 12-13, 16; Compl. ¶¶ 48-51, 57, 59-60, 63, 160-64]. Defendant further made its broadcast about Plaintiff when it attacked a corporate decision (which had to be made by the CEO) it claimed was fueled by monetary

---

[20] The remaining portions of two statements that Defendant seeks to dismiss are not at issue here: (1) "the investigation came in response to a CNN story this week" and (2) "the nation's largest accrediting agency for hospitals is evaluating 'patient safety-related events at St. Mary's Medical Center' in Florida." [Doc. 5-1 at pp. 22-23.] Plaintiff is not seeking damages for these portions of statements that then go on to discuss the false and defamatory claim that St. Mary's mortality rate was three times the national average. Though Defendant claims "the same [fair report privilege] applies to other of the challenged statements, Defendant does not enumerate any other statements. None of the statements at issue are from any governmental investigation. At no time has there been any claim by any governmental agency that St. Mary's mortality rate was three times the national average. In fact, the State of Florida responded to Defendant's reporting by chastising the network for its sensationalized and false reporting. [Ex. 31].

greed.  [Ex.s 2, 6; Compl. ¶¶ 49, 53].

Even if the CNN series had not directly identified Plaintiff (which it did), a publication could be "of and concerning" him without naming him.  "[T]he rule is that a publication must be construed in the light of all the attending circumstances, the cause and occasion of the publication, and all other extraneous matters which will tend to explain the allusion or point out the person in question."  *Southland Pub. Co. v. Sewell*, 111 Ga. App. 803, 807 (1965).  "[I]t is enough if the audience would be likely to think that the defendant was talking about the plaintiff."  *Desnick v. Am. Broad. Co.s, Inc.*, 44 F.3d 1345, 1349 (7th Cir. 1995); *see also Poorbaugh v. Mullen*, 653 P.2d 511, 521 (N.M. 1982) (finding statement actionable when it referred to plaintiff's company rather than him individually); *Brayton v. Crowell-Collier Pub. Co.*, 205 F.2d 644, 645 (2d Cir. 1953) (finding jury could reasonably infer that article read as a whole was actionable by plaintiff without mentioning him by name because of evidence that he controlled named corporation); *Maples v. Nat'l Enquirer*, 763 F. Supp. 1137, 1139 (N.D. Ga. 1990).

Here, once all attending circumstances and extraneous matters are considered, there can be no doubt that the CNN series was "of and concerning" Plaintiff.  Plaintiff was known to the local and national healthcare communities as the CEO of St. Mary's and the person in charge of all administration decisions.

[Ex.s 17 (¶ 16-19), 18 (¶ 11), 19 (¶ 6); Compl. ¶¶ 24, 175].  Defendant even admits that the decisions that led to St. Mary's mortality rate were Plaintiff's "professional responsibilities."  [Doc. 11 at p. 8].

There is no doubt the viewing audience saw the CNN series as being about Plaintiff, which is relevant to the "of and concerning" determination.  *Southland*, 111 Ga. App. at 807 ("The language of an alleged libel must be construed, not by what the writer intended to mean, but by the construction which would be placed upon it by the average and reasonable reader.").  As a direct result of the CNN series, Plaintiff was forced to resign as CEO and has not yet been able to secure new employment.  [Ex.s 17 (¶¶ 85, 90-99), 18 (¶¶ 15-23), 19 (¶¶ 10-15), 20 (¶¶ 9-13); Compl. ¶¶ 180-185].  Further, CNN viewers contacted Plaintiff directly to chastise him for killing babies at St. Mary's, calling him a "murderer," "baby killer," "corporate scum bag," and "corporate baby killer," demonstrating that they found the broadcast to be about Plaintiff.  [Ex. 17 ¶¶ 101-102; Compl. ¶¶ 186-187].

None of the cases Defendant cited are relevant here.  First, Defendant cites two cases about publications that made zero mention of the plaintiff.  *Fiske v. Stockton*, 171 Ga. App. 601 (1984); *Provisional Gov't of Republic of New Africa v.*

*Am. Broad. Co.s*, Inc., 609 F. Supp. 104 (D.D.C. 1985).[21]  Unlike those cases, here, there is ample mention of Plaintiff in the CNN series.  And not only is he mentioned, his picture is displayed on the screen, he is identified as the decision-maker of the hospital, and he is shown in an ambush interview.

Second, Defendant attempts to argue that a case suggesting that a company cannot sue for defamation when one of its officers is accused of personal misconduct unrelated to his work also shows that an officer cannot sue for defamation when the company he runs is accused of misconduct.  The latter does not follow from the former.  In *Pillsbury Co. v. Milky Way Productions, Inc.*, the defendant had written that a certain individual had syphilis.  The individual was the president of Pillsbury Co. (the plaintiff in the case).  Pillsbury claimed it was defamed by this personal statement about its president.  The Court ruled that a statement is not defamatory of an officer's corporation simply by virtue of the

---

[21] In *Fiske*, an article stated vaguely that a resort was being harassed by unnamed persons for serving liquor in a dry county, and plaintiffs sued claiming they were the ones accused in the article.  *Id.* at 601.  The court found that because there was "nothing whatsoever" to suggest the plaintiffs participated in the harassment, then the article was not "of and concerning" them.  *Id.* at 602.  And in *Provisional Gov't*, the article did not name the group that sued, let alone individual members of the group.  The court found that because there was no mention of the members in the article and "the surrounding circumstances [did] not implicate them in any fashion," then the article was not "of and concerning" them.  609 F. Supp. at 108.

statement being defamatory of the officer as an individual.  It is illogical, and a large leap, to claim the opposite is true as well.  While an individual person may engage in activity wholly unrelated to his employment, a corporation can only act through its decision makers.  Thus, if a corporation is accused of misconduct, there must be individuals who made the decisions to engage in misconduct.  The case law supports this distinction.  *Desnick*, 44 F.3d 1345 (ophthalmic surgeons could state claim for defamation when broadcast named only ophthalmic clinic, rather than individual surgeons); *Poorbaugh*, 653 P.2d 511 (real estate broker could state claim for defamation when communication referred to his company rather than him individually); *Connell v. A.C.L. Haase & Sons Fish Co.*, 257 S.W. 760 (Mo. 1923) (treasurer and manager of company could bring defamation claim for letter discussing audit revealing intentional false entries in company's financials).

Defendant has not cited a single case wherein an employee, much less a chief executive officer like Plaintiff, could not maintain a defamation action when his company was wrongfully accused of misconduct and the plaintiff was specifically mentioned in the publication as the decision-maker for the company.[22]

---

[22] It is also of no moment that more than one individual may be implicated in a company's alleged wrong-doing.  *See, e.g.*, *Desnick*, 44 F.3d 1345 (case by ophthalmic clinic and two unnamed ophthalmic surgeons allowed as to all three).

Third, Defendant relies on an inapposite case regarding distinct statements about two different individuals. *Gast v. Brittain*, 277 Ga. 340 (2003). In *Gast*, the defendant wrote a letter accusing an *unnamed* Boy Scout troop leader of being immoral and made specific allegations of criminal misconduct against another *named* troop leader. *Id.* at 341. The Court found there was a clear delineation between the allegations and that the troop leaders could not bring defamation lawsuits for statements aimed at the other. It was not a case where the same allegations of misconduct were aimed at both troop leaders. Here, Defendant alleges that the hospital, and by specific mention its CEO (Plaintiff), were intentionally causing surgeries to be performed without the requisite expertise simply to collect the money from the surgeries.

Fourth, Defendant attempts to shoehorn this case into the prohibition against government libel. *New York Times v. Sullivan*, 376 U.S. 254 (1964), set the precedent against government libel, which is "an otherwise impersonal attack on governmental operations." 376 U.S. at 290. The Court reasoned that without such a prohibition, there would be routine "transmuting [of] criticism of government, however impersonal it may seem on its face, into personal criticism, and hence potential liable, of the officials of whom the government is composed." *Id.* at 291-92. This case is not about the government or an impersonal attack.

The Court in *Sullivan* found that there was "no reference to respondent in the advertisement, either by name or official position" and there was "no other evidence to connect the statements with [plaintiff]." *Id.* at 288-92. Here, Plaintiff was specifically named, pictured, taped, and identified as CEO of the hospital.

Finally, Defendant's reliance on *800 Marketing* is misplaced. In that case, the defendant was awarded summary judgment, following full discovery, because the statements at issue were found to be substantially true. 2008 WL 2777140, at *5. Any discussion there regarding "of and concerning" was dicta, and it cannot support a dismissal here. There the statements were about two different and unrelated companies—not a hospital and its executive responsible for the decision-making that led to the misconduct at issue.

vi.    Plaintiff shows fault, damages, and defamatory meaning

Though Defendant does not argue the elements of defamatory meaning, fault, or damages, Plaintiff can show all three. First, Defendant accused Plaintiff of running a hospital that was killing babies at three times the national average in order to make more money. The CNN series is defamatory per se as it attacks Plaintiff's credentials as a hospital executive. O.C.G.A. § 51-5-4(a)(3); *Infinite Energy v. Pardue*, 310 Ga. App. at 357-58. It is also "reasonably susceptible of a defamatory meaning" because "it tends to expose [Plaintiff] to hatred, contempt or

aversion, or to induce an evil or unsavory opinion of him in the minds of a substantial number in the community." *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 360-61 (S.D.N.Y 1998).

Second, Defendant used manipulated statistics to create a false picture of the hospital's performance, when there was information available that should have alerted Defendant that it was wrong: the STS warns against raw comparisons and the STS awarded St. Mary's a two-star rating (which is inconsistent with it also having a mortality rate three times the national average). [Ex.s 23-25, 26 (p. 724), 27-28, 30; Compl. ¶¶ 92-99]. This amounts to at least negligence. *See Gettner v. Fitzgerald*, 297 Ga. App. 258, 265-66 (2009) (finding jury could find negligence when publisher had information that should have led to questioning sources and a pursuit for more information). And further, Plaintiff has presented evidence of actual malice: reliance on alleged STS-reported comparisons that Defendant knew were opposed to the STS's stated goals and objectives, knowledge of St. Mary's 2-star rating from the same organization Defendant claimed found its mortality rate to be three times the national average, knowledge of inappropriateness of non-risk-adjusted comparisons, and reliance on biased sources. [Ex.s 17 (¶¶ 36, 45-47), 21, 23-25, 29-30; Compl. 45, 79, 92-100, 107, 130, 133-140, 149].

Finally, Plaintiff was damaged as a result of the CNN series. He was vilified

in the community, forced out as CEO, denied other employment, rejected by his

peers, and subjected to harassing phone calls. [Ex.s 17 (¶ 85-108), 18 (¶¶ 15-23),

19 (¶¶ 10-15); 20 (¶¶ 9-13); Compl. ¶¶ 24, 175, 180-88].

## III. Defendant's motion to dismiss should be denied

After spending the majority of its brief arguing that Plaintiff must provide a

full evidentiary record to avoid the motion to strike, CNN spends barely two pages

arguing that the case should also be dismissed under Rule 12(b)(6). Defendant is

wrong because Plaintiff has more than adequately pled his case.

### A. Standard of review

A complaint should be dismissed under Rule 12(b)(6) only where it appears

that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). Courts should not pass upon the probability of

recovery; rather the complaint must only show a "reasonable expectation" of

recovery. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The court is

to accept as true all well-pleaded facts in a complaint, and all reasonable inferences

are construed in the light most favorable to the plaintiff. *Bryan v. Avado Brands,

Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999)). The motion to dismiss standard

does not change in a defamation case. *See, e.g.*, *No Witness, LLC v. Cumulus

Media Partners, LLC*, 2007 WL 413939935, at *14 (N.D. Ga. 2007) (applying

standard after *Twombly* and denying motion to dismiss defamation action).[23]

B.    Plaintiff has adequately pled all elements of his claim

Defendant claims that Plaintiff did not adequately allege that the CNN series was "of and concerning" him. But Plaintiff has done so. CNN does not challenge any other elements of Plaintiff's defamation claim, but rather claims three defenses to Plaintiff's falsity allegations, namely that (1) the CNN series was an "academic disagreement"; (2) the CNN series was mere "opinion"; and (3) parts of the CNN series were protected by the fair report privilege. None of these defenses apply here, and these defenses cannot be applied as a matter of law.

1.    *The CNN series was "of and concerning" him*

As an initial matter, Defendant completely ignores that whether a broadcast is "of and concerning" a plaintiff is an issue of fact for a jury and generally is not properly disposed of upon a motion to dismiss. *Maples*, 763 F. Supp. at 1140 (finding that whether article focused on alleged affair of Donald Trump and Marla Maples was "of and concerning" Marla Maples's father could not be decided as a

---

[23] Plaintiff adequately pled all elements for defamation in a non-conclusory fashion. Defendant's reliance on *Iqbal* is misplaced. *Iqbal* supports denying Defendant's motion. There the Court made clear that "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." 556 U.S. at 679.

matter of law); *Am. Broad.-Paramount Theatres, Inc. v. Simpson*, 106 Ga. App. 230, 242 (1962) ("A number of other cases have held that, as a general rule, the question of whether the defamatory publication was referable to plaintiff by the use of extrinsic facts was a jury question."); *Southland*, 111 Ga. App. at 807; *Horton v. Georgian Co.*, 165 S.E. 443, 448 (Ga. 1932).

Here, Plaintiff has more than adequately pled that the CNN series was "of and concerning" him: it identified him as part of the problem at St. Mary's by (1) identifying Plaintiff as St. Mary's CEO; (2) showing his picture; (3) ambushing him at this home, and (3) identifying the problem as a corporate decision made in the name of greed. [Compl. ¶¶ 48-51, 53, 57, 59-60, 63, 160-64].

Even without naming Mr. Carbone (which Defendant did), a jury could find the CNN series was "of and concerning" him from surrounding circumstances and extraneous matters to the broadcast itself. *Southland*, 111 Ga. App. at 807 ("[A] publication must be construed in the light of all the attending circumstances, the cause and occasion of the publication, and all other extraneous matters which will tend to explain the allusion or point out the person in question."); *Maples*, 763 F. Supp. at 1139; *Poorbaugh*, 653 P.2d at 521; *Brayton*, 205 F.2d at 645. Here, Plaintiff alleged that he was known in the local and national healthcare communities as the CEO of St. Mary's and was known to be responsible for

decision-making at the hospital.  [Compl. ¶¶ 24, 175].

A jury may also consider that viewers reasonably found that the CNN series was about Plaintiff.  *Southland*, 111 Ga. App. at 807 ("The language of an alleged libel must be construed, not by what the writer intended to mean, but by the construction which would be placed upon it by the average and reasonable reader."); *Desnick*, 44 F.3d at 1349 ("[I]t is enough if the audience would be likely to think that the defendant was talking about the plaintiff.").  Here, Plaintiff alleged that because of how he was portrayed in the CNN series, he was vilified in the community, forced out as CEO, denied other employment, rejected by his peers, and subjected to harassing phone calls from those who found the CNN series was about him.  [Compl. ¶¶ 24, 175, 180-88].

With one exception, all the cases Defendant cites to support its claim that the Court should dismiss Plaintiff's complaint at this early stage are summary judgment cases or appeals from trial verdicts.  [Doc. 5-1 at pp. 13-16].  The only case Defendant cited dismissing a complaint before discovery was one with no allegations that the publication mentioned the plaintiffs or that surrounding circumstances implicated them "in any fashion."  *Provisional Gov't.*, 609 F. Supp. at 108 (D.D.C. 1985).  That is not the case here.

## 2. *This case is not about an academic disagreement*

The CNN series did not reflect an academic disagreement because (1) there is no academic disagreement with regard to how mortality rates should be reported and (2) even assuming there was, the CNN series was not about that.

No one claims that it is helpful for consumers to compare raw mortality data. And Defendant has not claimed otherwise. The sources that Defendant claims to rely upon warn against the use of non-risk-adjusted mortality rates. [Compl. ¶¶ 92-99]. Defendant knew there was no medical or academic support for using non-risk-adjusted mortality rates. [Compl. ¶¶ 94-96, 129-30, 147-49].

Defendant's broadcast was not about such an academic disagreement even assuming one existed (which it does not). An academic disagreement is present when the research, not the person is criticized. *See, e.g., Dilworth*, 75 F.3d at 310 ("The case before us is one in which not the character but the ideas of the scholar are attached."). Here, Defendant did not criticize the use of risk-adjusted data versus raw data, it criticized Plaintiff and the hospital for allegedly killing babies at an outrageously high rate. *See supra* Section I.C.2.ii, pp. 26-27.

## 3. *This case is not about Defendant's "opinion" of Plaintiff*

The CNN series was not opinion. Instead, the CNN series is capable of being proven true or false, which makes it actionable and not protected opinion.

*Infinite Energy*, 310 Ga. App. at 357-58. Whether St. Mary's had a mortality rate three times the national average is not an opinion—that is either a true statement or a false statement. The statement is unequivocally false because St. Mary's mortality rate was in line with the national average. [Compl. ¶¶ 7, 106, 124].

Even assuming Defendant stated an "opinion" that St. Mary's mortality rate was three times the national average, Defendant did not disclose the factual basis for its opinion, which prevents dismissal. *See*, *e.g.*, *800 Mktg.*, 2008 WL 2777140, at *6; *see supra* Section I.C.2.iii, pp. 29-31.

4. *The fair report privilege does not apply here*

The fair report privilege does not apply to this case. *See supra* Section I.C.2.iv., pp. 31-36. But even if it could apply, whether a fair report was made is a question of fact for the jury. *Bakhtiarnejad v. Cox Enterprises, Inc.*, 247 Ga. App. 205, 209 (2000) (reversing grant of motion to dismiss because whether a fair report was made was issue of fact); *AirTran*, 66 F. Supp. 2d at 1365.[24]

---

[24] The case that Defendant cited claiming that a court could determine whether a "fair report" was made as a matter of law was about a summary judgment—not a motion to dismiss. While a court may review the evidence to determine if the summary judgment standard was reached, a court cannot decide whether a "fair report" was made on a motion to dismiss. Indeed, none of the cases cited by Defendant are motion to dismiss cases; they are all summary judgment cases decided upon a full discovery record. [Doc. 5-1 at pp. 20-22].

Further, Plaintiff alleged that Defendant acted with actual malice in publishing the CNN series.  [Compl. ¶¶ 45, 79, 92-93, 101, 130, 133-140, 149].  A showing of actual malice erases any privilege of a fair report.  *AirTran*, 66 F. Supp. 2d at 1365.  And whether actual malice is shown cannot be decided at the motion to dismiss stage.  *Id.* (finding summary judgment premature where plaintiff had not yet conducted discovery on its allegations of actual malice).

## CONCLUSION

Defendant seeks to impose an inapplicable and onerous evidentiary burden on Plaintiff from the very start of the case—before any discovery has yet occurred.  Plaintiff has made a well pleaded complaint, has gone further and provided evidentiary support for his claims, and is now entitled to proceed with his case.

The Court should rule that Georgia's new "anti-SLAPP" statute does not apply and deny Defendant's motion to strike accordingly, or find that Plaintiff has met his burden under the statute.  And the Court should deny Defendant's motion to dismiss out of hand.  Plaintiff has more than met his pleading burden.

Respectfully submitted this 23rd day of September 2016.

/s/ L. Lin Wood                          Stacey Godfrey Evans
L. Lin Wood                              stacey@sgevanslaw.com
lwood@linwoodlaw.com                     Georgia Bar No. 298555
Georgia Bar No. 774588
Jonathan D. Grunberg                     **S.G. Evans Law, LLC**

Georgia Bar No. 869318

**L. Lin Wood, P.C.**
1180 West Peachtree Street
Suite 2400
Atlanta, Georgia 30309
404-891-1402
404-506-9111 (fax)

1180 West Peachtree Street
Suite 2400
Atlanta, Georgia 30309
404-891-1404
678-868-1230 (fax)

## CERTIFICATION UNDER L.R. 7.1D

Pursuant to Northern District of Georgia Civil Local Rule 7.1D, the undersigned counsel certifies that this RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE OR, IN THE ALTERNATIVE, TO DISMISS is a computer document and was prepared in Times New Roman 14 point font, as mandated in Local Rule 5.1C.

This 23rd day of September 2016.

/s/ L. Lin Wood
L. Lin Wood

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO STRIKE OR, IN THE ALTERNATIVE, TO DISMISS with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record.

This <u>23rd</u> day of September 2016.

<u>/s/ L. Lin Wood</u>
L. Lin Wood